## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THE UNIVERSITY OF LOUISIANA SYSTEM** | : | |
| | : | |
| | : | **Civil Action No.** |
| **VERSUS** | : | |
| | : | **Section** |
| **AMERISOURCEBERGEN DRUG** | : | |
| **CORPORATION, CARDINAL** | : | **Judge** |
| **HEALTH, INC., McKESSON** | : | |
| **CORPORATION, PURDUE PHARMA** | : | **Magistrate Judge** |
| **L.P., PURDUE PHARMA, INC., THE** | : | |
| **PURDUE FREDERICK COMPANY,** | : | |
| **INC., TEVA  PHARMACEUTICAL** | : | |
| **INDUSTRIES, LTD., TEVA** | : | |
| **PHARMACEUTICALS USA, INC.,** | : | |
| **CEPHALON, INC., JOHNSON &** | : | |
| **JOHNSON, JANSSEN** | : | |
| **PHARMACEUTICALS, INC.,** | : | |
| **ORTHO-MCNEIL-JANSSEN** | : | |
| **PHARMACEUTICALS, INC. n/k/a** | : | |
| **JANSSEN PHARMACEUTICALS,** | : | |
| **INC., JANSSEN PHARMACEUTICA** | : | |
| **INC. n/k/a JANSSEN** | : | |
| **PHARMACEUTICALS, INC.,** | : | |
| **NORAMCO INC., ENDO HEALTH** | : | |
| **SOLUTIONS INC., ENDO** | : | |
| **PHARMACEUTICALS INC.,** | : | |
| **PAR PHARMACEUTICAL, INC.,** | : | |
| **ALLERGAN PLC f/k/a ACTAVIS PLC.,** | : | |
| **WATSON PHARMACEUTICALS, INC.** | : | |
| **n/k/a ACTAVIS, INC., WATSON** | : | |
| **LABORATORIES, INC., ACTAVIS** | : | |
| **LLC., ACTAVIS PHARMA, INC. f/k/a** | : | |
| **WATSON PHARMA, INC.,** | : | |
| **MALLINCKRODT PLC.,** | : | |
| **MALLINCKRODT LLC.,** | : | |
| **CVS HEALTH CORPORATION,** | : | |
| **RITE AID OF MARYLAND, INC.,** | : | |
| **WALGREENS BOOTS ALLIANCE,** | : | |
| **INC, a/k/a WALGREEN CO., and** | : | |
| **WAL-MART INC.** | : | |

---

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

*"Our nation is in crisis…Since 1999, the number of opioid overdoses in America have quadrupled according to the CDC. Not coincidentally, in that same period, the amount of prescription opioids in America have quadrupled as well."*[1]

This is a civil action filed pursuant to 18 U.S.C. § 1961, *et seq.*, and other federal and state laws, for "RICO" violations.   Plaintiff seeks declaratory and injunctive relief, actual, consequential, treble, and exemplary damages, and all other relief this Honorable Court deems just and proper.  The primary cause of this action is a widespread criminal *enterprise* through which Defendants engaged in a *pattern of racketeering activity* across state lines, including through and across Louisiana state lines (including through and across the boundaries of The University of Louisiana System), and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past couple of decades, as set forth more fully below.  Moreover, Defendants' distribution and diversion of opioids into Louisiana, and into the several campuses and facilities within The University of Louisiana System and surrounding areas, created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

## I.    PARTIES

1.    Plaintiff, The University of Louisiana System, brings this civil action individually and on behalf of the members of its system as set forth below, against Defendants for operating a continuous criminal enterprise in violation of federal and state law, and to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate its nuisance, and to recoup monies spent because of Defendants' false, deceptive, and/or unfair marketing and unlawful distribution of dangerous prescription opioids. The University of Louisiana System, a political subdivision or

---

[1] *The President's Commission on Combating Drug Addiction and the Opioid Crisis,* (Nov. 1, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf at 115.

agency of the State of Louisiana, having been created in accordance with Article VIII Section 6 of the Constitution of Louisiana, and pursuant to La. R.S. 17:3217, who is composed of the institutions under its supervision and management including, but not limited to; Grambling State University at Grambling, Louisiana Tech University at Ruston, McNeese State University at Lake Charles, Nicholls State University at Thibodaux,  Northwestern State University of Louisiana at Natchitoches, Southeastern Louisiana University at Hammond,  The University of Louisiana at Lafayette, The University of Louisiana at Monroe, The University of New Orleans, along with all other colleges, universities, schools, institutions and/or programs also under its supervision. Plaintiff has standing to bring this action pursuant to La. R.S. 17:3351 and the Constitution and laws of the State of Louisiana.   Plaintiff brings this action separate and apart from any and all claims made by the State of Louisiana.

2.    Each of the colleges set forth in paragraph (1.) above and institutions which along with all other colleges, universities, schools, institutions or programs also under the supervision The University of Louisiana System provide comprehensive benefits and services to their students, employees, and patrons, which include; but are not limited to, campus police, campus infirmaries, and health care.  Furthermore, plaintiff provides medical insurance coverage and long-term disability insurance to its employees.

3.    Plaintiff has standing pursuant to La. R.S. 17:3351 and the Constitution and laws of the State of Louisiana to recover damages incurred as a result of Defendants' actions and omissions.  Plaintiff also has standing to bring all claims pled herein, including, *inter alia*, standing to recover damages caused by a criminal act; standing to recover damages under the Louisiana Unfair Trade Practices Act; standing to bring claims under the Louisiana racketeering statute; and standing to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons"

have standing).

4.      Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, and patrons and/or residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs associated with increased healthcare and healthcare insurance; (3) costs regarding disability payments; (4) costs associated with special education means, including, but not limited to, special programs for students, employees, and patrons and/or residents with opioid-related learning disabilities, or for students, employees, and patrons and/or residents in need of psychological counseling due to opioid-related crisis; (5) costs associated with providing care for students, employees, and patrons and/or residents suffering from opioid-related disability or incapacitation; (6) costs associated with increased school security and/or campus police costs for all campuses and/or facilities of the University of Louisiana System (including but not limited to increased training, increased staffing, and increased equipment purchases); (7) increased training of faculty, increased staffing of faculty, and increased equipment purchases for faculty; and (8) treble damages. These damages have been suffered, and continue to be suffered directly, by Plaintiff.

5.      Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.  Plaintiff is authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance.

Defendants named herein are:

**A.      Manufacturer/Marketing Defendants.**

6.      At all relevant times, Manufacturer/Marketing Defendants packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and/or purported to warn, or purported to inform, the medical community, treating physicians, prescribers, the public, consumers, and/or users regarding the benefits and risks associated with the use of prescription opioid drugs. At all times, Manufacturer/Marketing Defendants manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

7.      **Purdue Entities.**

   a. Defendant PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut;

   b. Defendant PURDUE PHARMA, INC. is a New York corporation with its principal place of business in Stamford, Connecticut; and

   c. Defendant THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

8.      Purdue (including their DEA registrant subsidiaries and affiliates) manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States, including within all parts of the State of Louisiana, The University of Louisiana System, and within this judicial district.

9.      Purdue made thousands of payments to physicians nationwide, including in Louisiana, for promotional activities designed to deceptively promote and maximize the use of opioids.

10.     **Cephalon Entities.**

   a. Defendant TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a

5

Delaware corporation and is a wholly-owned subsidiary of Teva Ltd. in Pennsylvania. From 2005 to 2009, Teva USA sold generic opioids, including the generic form of OxyContin. Teva USA is a wholly-owned subsidiary of Teva Ltd., an Israeli corporation with its principal place of business in Petah Tikva, Israel.

b.  Defendant CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

11.  Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Cephalon, Inc., and their DEA registrant subsidiaries and affiliates are referred to as "Cephalon." Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States, including within all parts of the State of Louisiana, The University of Louisiana System, and within this judicial district. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[2] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[3]

12.  Teva Ltd., Teva USA, and Cephalon, Inc. work together (and at all times relevant herein have worked together) closely to market and sell Cephalon products in the United States. Upon information and belief, Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States, including within all parts of the State of Louisiana, The University of Louisiana System, and within this judicial district, through Teva USA, and has done so since its

---

[2] *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://accessdata .fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.
[3] *Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the medical community, treating physicians, consumers, the public, and/or end users. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that Teva USA submitted the guide, and directs physicians to contact Teva USA to report adverse events.

13.     Upon information and belief, all of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[4]   Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including, *inter alia*, sales of Fentora®.[5] Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

14.     **Janssen Entities.**

a.  Defendant JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey and is a wholly-owned

---

[4] E.g., ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).
[5] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013),
 http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

subsidiary of JOHNSON & JOHNSON ("J&J").

b.  Defendant JOHNSON & JOHNSON is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

c.  Defendant NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly-owned subsidiary of J&J until July 2016.

d.  Defendant ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

e.  Defendant JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and J&J corresponds with the FDA regarding Janssen Pharmaceuticals' products.

15.    Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs, and Janssen Pharmaceuticals' profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica Inc., Noramco, and J&J are herein referred to as "Janssen."

16.    Janssen, like many other companies, has a corporate code of conduct, which clarifies the organization's mission, values, and principles. Janssen's employees are required to read, understand, and follow its Code of Conduct for Health Care Compliance. J&J imposes this code of conduct on Janssen as a pharmaceutical subsidiary of J&J. Documents posted on J&J's and Janssen's websites confirm J&J's control of the development and marketing of opioids by Janssen.

17. Defendant Janssen manufactures, promotes, sells, and distributes drugs in the United States, throughout Louisiana, throughout The University of Louisiana System, and throughout this judicial district, including the opioid Duragesic (fentanyl). Upon information and belief, before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for millions of dollars in sales in 2014.

18. **Endo Entities.**

    a. Defendant ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

    b. Defendant ENDO PHARMACEUTICALS INC. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation, with its principal place of business in Malvern, Pennsylvania.

    c. Defendant PAR PHARMACEUTICAL, INC. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc., a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc., a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. (collectively "Par Pharmaceutical"). Par Pharmaceutical was acquired by Endo International PLC in September 2015 and is an operating company of Endo International PLC.

19. Defendants Endo Health Solutions, Endo Pharmaceuticals, Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively "Endo") develop, market, and sell prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including in the State of Louisiana, The University of Louisiana System, and

this judicial district. Upon information and belief, opioids made up roughly $400 million of Endo's overall revenues of around $3 billion in 2012. Opana ER yielded billions of dollars in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

20.     **Actavis Entities.**

a.   Defendant ALLERGAN PLC is a public limited company incorporated in Ireland, with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015, and the combined company changed its name to ALLERGAN PLC. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to ACTAVIS, INC. as of January 2013, and then ACTAVIS PLC in October 2013.

b.   Defendant WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan plc (Allergan Finance f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).

c.   Defendant ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do business with the Louisiana Secretary of State as a Delaware corporation, with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC.

d.   Defendant ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc. and Watson Pharma, Inc. are owned by Allergan plc, which uses them to market and

sell its drugs in the United States. Upon information and belief, Defendant Allergan plc exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are hereinafter referred to as "Actavis."

21.    Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States, including throughout the State of Louisiana, The University of Louisiana System, and within this judicial district. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

22.    **Mallinckrodt Entities.**

a.    Defendant MALLINCKRODT PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.

b.    MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its headquarters in Hazelwood, Missouri. Mallinckrodt LLC is a wholly-owned subsidiary of Mallinckrodt plc. Mallinckrodt plc and Mallinckrodt LLC are hereinafter referred to as "Mallinckrodt."

23.    Mallinckrodt manufactures, markets, and sells drugs in the United States, the State of Louisiana, The University of Louisiana System, and this judicial district, including generic

oxycodone, of which it is one of the largest manufacturers. Mallinckrodt's manufacturing touches all aspects of the supply chain, including importing the raw opioid materials, manufacturing the product, and marketing and selling the product to drug distributors.

24.     In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

25.     Made herein, Purdue, Actavis, Cephalon, Janssen, Endo, and Mallinckrodt are referred to as "Marketing Defendants" and/or "Manufacturing Defendants."

**B. Distributor Defendants.**

26.     The Distributor Defendants are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal and/or state law.   The Distributor Defendants are engaged in "wholesale distribution," as defined under law.   Plaintiff alleges the unlawful conduct by Distributor Defendants is responsible for the volume of prescription opioids plaguing the United States, the State of Louisiana, The University of Louisiana System, and this judicial district.

27.     McKESSON CORPORATION is registered with the Louisiana Secretary of State as a Delaware corporation, which may be served through its registered agent for service of process, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802. McKesson Corporation has its principal place of business located in San Francisco, California.   Through its various DEA registered subsidiaries and affiliates, McKesson Corporation distributes pharmaceutical drugs, including opioids, throughout the country. At all relevant times, McKesson Corporation operated as a licensed pharmacy wholesaler throughout the United States, including

in Louisiana.

28.    CARDINAL HEALTH, INC. is an Ohio corporation with its principal office located in Dublin, Ohio, and may be served through its registered agent for service of process, CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.  Through its various DEA registered subsidiaries and affiliates, Cardinal Health, Inc. distributes pharmaceutical drugs, including opioids, throughout the country. At all relevant times, Cardinal Health, Inc. operated as a licensed pharmacy wholesaler throughout the United States, including in Louisiana.

29.    AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is registered with the Louisiana Secretary of State as a Delaware corporation, which may be served through its registered agent for service of process, CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania. Through its various DEA registered subsidiaries and affiliates, AmerisourceBergen distributes pharmaceutical drugs, including opioids, throughout the country. At all relevant times, AmerisourceBergen operated as a licensed pharmacy wholesaler throughout the United States, including in Louisiana.

30.    Plaintiff names the three (3) wholesale distributors (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) that, upon information and belief, dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange, whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998).  Each of the "Big 3" has been investigated and/or fined by the DEA for the failure to report suspicious orders.  Plaintiff has reason to believe that each of the "Big 3" has engaged in unlawful conduct resulting in the diversion of prescription opioids into its community, and that discovery will likely reveal others who likewise engaged in

unlawful conduct. Plaintiff names each of the "Big 3" herein as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing the State of Louisiana and The University of Louisiana System.

### C. Pharmacy Defendants

31.    Defendant CVS HEALTH CORPORATION ("CVS") is a Delaware corporation with its principal place of business in Rhode Island.  CVS Health Corporation conducted business as a licensed wholesale distributor under the following named business entities: CVS Indiana, LLC.; CVS Orlando FL Distribution; CVS Pharmacy, Inc.; CVS RX Services, Inc., d/b/a CVS Pharmacy Distribution Center; CVS TN Distribution, LLC; CVS VERO FL Distribution, LLC; CVS 5282 LA LLC; CVS 5374 LA, LLC; CVS 5469, LLC; CVS Revco D.S., Inc.; and Louisiana CVS Pharmacy LLC (collectively "CVS"). At times material, CVS, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor, including in Louisiana. At times material, CVS distributed prescription opioids throughout the United States, including in or about Louisiana and The University of Louisiana System where Plaintiff is located.

32.    Defendant RITE AID OF MARYLAND, INC. ("Rite Aid") is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania.  Rite Aid conducted business under the following named business entities: Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center Inc.; Rite Aid Corporation; Rite Aid of Pennsylvania, Inc.; Rite Aid Headquarters Corporation; and K&B Louisiana Corporation as successor in interest to Katz & Besthoff (collectively "Rite Aid").  At times material, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor. At times material, Rite Aid distributed prescription opioids throughout the United

States, including in or about Louisiana and The University of Louisiana System where Plaintiff is located.

33.    Defendant WALGREENS BOOTS ALLIANCE, INC., also known as Walgreen Co. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. Walgreens Boots Alliance Inc. conducted business as a licensed wholesale distributor under the following named business entities: Walgreen Co.; Walgreen Eastern Co., Inc.; Walgreen Arizona Drug Co.; Walgreens Mail Service, LLC; Medication Adherence Solutions LLC, formerly Walgreens Long-Term Care Pharmacy, LLC; SeniorMed, LLC; Walgreen Louisiana Co., Inc.; Walgreen Medical Supply LLC; Walgreen Pharmacy Services Midwest, LLC; and Walgreen Realty Resources (collectively "Walgreens"). At times material, Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor. At times material, Walgreens distributed prescription opioids throughout the United States, including in or about Louisiana and The University of Louisiana System where Plaintiff is located.

34.    Defendant WAL-MART INC., formerly known as Wal-Mart Stores, Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Wal-Mart Stores, Inc. conducted business as a licensed wholesale distributor under the following named business entities: Wal-Mart Warehouse #28; Wal-Mart Warehouse #6045 aka Wal-Mart Warehouse #45; Wal-Mart Warehouse # 6046 aka Wal-Mart Warehouse #46; and Martin Family Private Holdings, LP (collectively "Wal-Mart").  At times material, Walmart, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor. At times material, Wal-Mart distributed prescription opioids throughout the United States, including in or about Louisiana and The University of Louisiana System where Plaintiff is

located.

35.    Collectively, Defendants CVS, RITE AID, WALGREENS, AND WALMART are referred to as "National Retail Pharmacies."

**D.    Agency and Authority**

All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## JURISDICTION AND VENUE

36.    This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, based on Defendants' violations of federal law, specifically 18 U.S.C. § 1961, *et seq.* ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"), 18 U.S.C. § 1965 pertaining to RICO jurisdiction, and supplemental jurisdiction over the state law claims set forth below pursuant to 28 U.S.C. § 1367, because those state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

37.    This Court has personal jurisdiction over Defendants, because they conduct business in Louisiana, purposefully direct or directed their actions toward Louisiana, consented to being sued in Louisiana by registering an agent for service of process in Louisiana, and/or consensually submitted to the jurisdiction of Louisiana when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Louisiana necessary to constitutionally permit this Court to exercise jurisdiction.  This Court also has personal jurisdiction over all Defendants under 18 U.S.C. 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service, and Plaintiff

demonstrates national contacts.  Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial.  Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the State of Louisiana, the damages were sustained by Plaintiff within the State of Louisiana, and the damages sustained by Plaintiff were a result of Defendants' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of Louisiana.

38.    Venue is appropriate in this court, as various defendants herein are registered to do business in the judicial district in which this matter is filed, may be served in this judicial district, conduct the business activities described herein in this judicial district, and various actions and/or inactions sued upon occurred in this judicial district. 18 U.S.C. § 1965(a); 28 U.S.C. §1391(b)(2).

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS
### AND TO ALL DEFENDANTS

39.    While these Defendants may operate seemingly legitimate organizations and businesses, the facts alleged herein establish that these organizations and businesses conducted decades of concerted activities for illegal purposes in violation of federal and state RICO statutes and other federal and state laws.  The pattern of illegal activities committed by the Defendants, the "Predicate Acts" described herein and discussed below, were done for the purpose of financial gain and were done continuously over numerous years and continue to this day.  By the acts alleged herein, Defendants, jointly and severally, aided, abetted, and conspired to violate RICO and other laws through their ongoing criminal enterprise.

40.    Before the 1990's, accepted standards of medical practice dictated that opioid analgesic pain relievers should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative ("hospice" or "end-of-life") care.  This is because opioid analgesic pain relievers did not improve patients' ability to overcome pain and function, and there

was evidence of greater pain complaints, as patients developed tolerance to opioids over time. The serious risk of addiction and other negative side effects discouraged or prohibited their use.

41.     Since the 1990s, various Defendants have developed an efficient and manipulative marketing scheme to take advantage of the lucrative chronic-pain patient market throughout the nation, the State of Louisiana, The University of Louisiana System, and this judicial district. Defendants used both direct marketing and unbranded advertising sent by seemingly independent third-parties to spread false and deceptive statements about the risks and benefits of long-term opioid use. These statements not only benefited the Defendants, they benefited third-parties and other opioid manufacturers. However, these deceptive statements were not only unsupported by or contrary to scientific evidence, they were contrary to pronouncements and guidance from the United States Food and Drug Administration and the Centers for Disease Control and Prevention. Compounding the issue, Defendants targeted susceptible prescribers and vulnerable patient populations.

42.     Defendants' push to expand prescription opioid use has resulted in a death toll that has steadily climbed, with no signs of slowing.  The number of opioid overdoses resulting in death in the United States rose from 8,000 in 1999 to over 20,000 in 2009, and over 33,000 in 2015.[6] Startlingly, between September 2016 through September 2017, opioid overdoses claimed 45,000 lives;[7] many dying from opioids prescribed by doctors to treat pain.[8]

43.     The prescription opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone,

---

[6] *Overdose Death Rates*, NIH Nat'l Inst. On Drug Abuse, *available at,* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (last accessed August 3, 2018).
[7] *Understanding the Epidemic*, Ctrs. For Disease Control and Prevention*, available at*, https:www.cdc.gov/drugoverdose/epidemic/index.html (last accessed August 3, 2018).
[8] *Prescription Opioid Overdose Data,* Ctrs. For Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/overdose.html (last accessed August 3, 2018).

hydrocodone, and fentanyl.

44.    Most of the overdoses from non-prescription opioids are also directly related to prescription pills.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin.  In fact, the Centers for Disease Control ("CDC") identified addiction to prescription opioids as the strongest risk factor for heroin addiction.

45.    The instant lawsuit identifies that the Defendants' marketing schemes and their supply chain schemes are primary, contributing causes to the present opioid crisis.

46.    First, the Marketing Defendants spread their false and deceptive statements (or false and misleading advertising campaigns) by marketing their branded opioid analgesic pain relievers directly to doctors and patients in Louisiana, including within The University of Louisiana System, and this judicial district. Further, the Marketing Defendants also deceptively deployed supposed unbiased and independent third-parties, who they actually controlled, to spread their false and deceptive statements throughout Louisiana, including within The University of Louisiana System, and this judicial district, about the benefits of opioid analgesic pain relievers for the treatment of chronic pain, misleadingly implying that opioids would provide long-term pain relief and functional improvement.

47.    To further their scheme, the Marketing Defendants also promoted the use of opioids for chronic pain through "detailers" (sales representatives who visited individual doctors and medical staff in their offices) and small-group speaker programs. Defendants have not corrected this misinformation. Each Defendant devoted, and continues to devote, massive resources to direct sales contacts with doctors, including doctors within the State of Louisiana, The University of Louisiana System, and this judicial district.

48.    To give the impression of legitimacy, the scheme also included the use of doctors to serve on speakers' bureaus, and to attend programs with speakers or at meals that were paid for

by various Marketing Defendants. Speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. Nonetheless, the speakers gave the false impression that they are providing unbiased and medically-accurate presentations, when, in fact, they present a script prepared by the Marketing Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct the Marketing Defendants' prior misrepresentations about the risks and benefits of opioids.

49.    These Marketing Defendants employed the same marketing plans and strategies and deployed the same messages in Louisiana, The University of Louisiana System, and this judicial district, as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters.  This comprehensive approach ensures that the Marketing Defendants' messages are accurately and consistently delivered across marketing channels (including detailing visits, speaker events, and advertising) and in each sales territory. It includes:

- national and regional sales representative training;

- national training of local medical liaisons;

- company employees responding to physician inquiries;

- centralized speaker training;

- single sets of visual aids;

- speaker slide decks and sales training materials; and

- nationally-coordinated advertising.

50.    The Marketing Defendants also deceptively marketed opioids in Louisiana, The University of Louisiana System, and this judicial district, through unbranded advertising that

promotes opioid use generally, but does not name a specific opioid. This advertising scheme was ostensibly created and disseminated by independent third-parties; however, the Marketing Defendants controlled the deceptive messages put out by these third-parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain by funding, directing, reviewing, editing, and distributing this unbranded advertising. The Marketing Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, continuing medical education events ("CMEs"), medical conferences, and seminars.  To this end, the Marketing Defendants used third-party public relations firms to help control the messages originating from third-parties.

51.    The Marketing Defendants also marketed unbranded advertising through third-parties in order to avoid regulatory scrutiny, because such advertising is not submitted to and is typically not reviewed by the FDA.  The Marketing Defendants funded, directed, and controlled these third-parties to conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.  This deceptive, unbranded marketing often contradicted the information they provided in their branded materials and was reviewed by the FDA.

52.    The Marketing Defendants utilized a small circle of doctors who, upon information and belief, were selected, funded, and elevated because of their public positions supporting the use of opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

53.    The Marketing Defendants paid KOLs to serve as consultants, or on their advisory boards, and to give talks or present CMEs. The Marketing Defendants' KOLs wrote, consulted on, edited, and lent their names to books and articles, gave speeches, and participated in CMEs supporting the use of chronic opioid therapy. The Marketing Defendants created opportunities for KOLs to participate in research studies suggested or chosen by the Marketing Defendants, and

then cited and promoted favorable studies or articles by their KOLs. By contrast, the Marketing Defendants did not support, acknowledge, or disseminate doctor publications unsupportive or critical of chronic opioid therapy. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying the Marketing Defendants by advancing their marketing goals.

54.    The Marketing Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, as well as on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. The Marketing Defendants were able to direct and exert control over each of these activities through their KOLs.

55.    The Marketing Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for treating chronic pain. Under the Marketing Defendants' direction and control, these "Front Groups" generated treatment guidelines, unbranded materials, and programs favoring chronic opioid therapy. They assisted the Marketing Defendants by responding to negative articles, by advocating against regulatory changes that would limit prescribing opioids to the vulnerable patient populations targeted by the Marketing Defendants, in accordance with scientific evidence and research.

56.    The Marketing Defendants funded these "Front Groups" and exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content and by funding their dissemination. In doing so, the Marketing Defendants ensured the Front Groups would generate only the messages the Marketing Defendants wanted to distribute.

57.    These Front Groups include the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain

Foundation ("NPF"), Pain & Policy Studies Group ("PPSG"), and American Pain Foundation ("APF").[9]

58.    APF published articles to be read by doctors, patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.  The articles misrepresented: that opioid dependence could be easily addressed by tapering; that opioid withdrawal is not difficult; that doctors could increase opioid dosages indefinitely without added risk; and that long-term opioid use improved patients' function and quality of life. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes—including death—among returning soldiers. APF also engaged in a significant multimedia campaign—through radio, television, and the internet—to educate patients about their "right" to pain treatment, namely opioids.  Upon information and belief, all of these programs were available nationally and were intended to reach Louisiana residents, The University of Louisiana System students, employees, patrons and/or residents of this judicial district.

59.    The APF was often called upon to provide "patient representatives" for Defendants' promotional activities. The Marketing Defendants paid the APF to promote, market, and "legitimize" widespread opioid use throughout the nation.

60.    The American Academy of Pain Medicine ("AAPM") issued treatment guidelines and hosted various medical education programs essential to the Marketing Defendants' deceptive marketing encouraging chronic opioid therapy. For these efforts, opioid manufacturers paid AAPM millions of dollars and provided its members with numerous benefits.

---

[9] See generally, e.g., letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015),
 https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf.

61.     Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. Doctors, especially general practitioners and family doctors targeted by the Marketing Defendants, who are neither experts nor are they trained in the treatment of chronic pain, rely on treatment guidelines. Treatment guidelines not only directly informed doctors' prescribing practices, but they also are cited throughout the scientific literature and referenced by third-party payers in determining whether they should cover treatments for specific indications.

62.     Specifically, in or about 1997, the AAPM and the APS issued *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.

63.     The AAPM and the APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[10] Upon information and belief, numerous panel members who drafted the AAPM/APS Guidelines received financial support from various Marketing Defendants.

64.     The 2009 Guidelines also promote opioids as "safe and effective" for treating chronic pain and concluded that the risk of addiction is manageable for patients, regardless of past abuse histories. These AAPM/APS Guidelines have been a particularly effective channel of deception and influenced not only treating physicians but also the body of scientific evidence on opioids. Notably, the AAPM/APS Guidelines have been cited hundreds of times in academic literature and were disseminated in Louisiana, The University of Louisiana System, and in this judicial district, at all times relevant herein.

65.     To convince doctors and patients throughout the United States, including in

---

[10] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. PAIN 113 (2009).

Louisiana, The University of Louisiana System, and in this judicial district, that opioids can and should be used to treat chronic pain, Defendants had to convince them that long-term opioid use is both safe and beneficial. Knowing they could only do so by deceiving those doctors and patients about the risks and benefits of long-term opioid use, the Marketing Defendants made claims that were not supported by or were contrary to the scientific evidence. Further, even though pronouncements by and guidelines from the FDA and the CDC based on that evidence confirmed their claims were false and deceptive, the Marketing Defendants have not corrected them, nor have they instructed their KOLs or Front Groups to correct them, and they continue to spread them today.

66.     The Marketing Defendants' push to increase opioid sales worked.  Through their publications and websites, endless stream of sales representatives, "education" programs, and other means, the Marketing Defendants dramatically increased their sales of prescription opioids and reaped billions of dollars of profit as a result.  Since 1999, the amount of prescription opioids sold in the U.S. nearly quadrupled.  In 2016, 289 million prescriptions for opioids were filled in the U.S.

67.     On the supply side, the crisis was fueled by those involved in the supply chain of opioids, including manufacturers and distributors (each named herein, collectively referred to as "Defendants"), who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. Defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and taking steps to halt, suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

68.     By providing misleading information to doctors about the rarity of addiction, and

that opioids are safe even at high doses, then pressuring doctors into prescribing their products by arguing that "no one should be in pain," the Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates. The scheme worked; today 1 in 4 patients who receive prescription opioids for chronic pain in a primary care setting struggles with addiction. With that, the present overdose death rates are five times higher than seen in 1999.

69.     Defendants' aforementioned false claims and misrepresentations are contrary to longstanding scientific evidence. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the possible harms of opioids, including having a "high potential for abuse," and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options," like non-opioid drugs, have failed. The FDA has further acknowledged that the risk of overdose is not limited to patients who seek drugs illicitly.

70.     Despite the FDA's warning, Defendants falsely instructed doctors and patients that the signs of addiction are potentially signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction."[11] Defendants falsely claimed that pseudo-addiction is substantiated by scientific evidence.

71.     However, the 2016 CDC Guideline rejects the concept of pseudo-addiction, and instead explains that "patients who do not experience clinically meaningful pain relief early in treatment…are unlikely to experience pain relief with longer-term use," and that physicians should

---

[11] *See*, Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).

"reassess[] pain and function within 1 month" in order to decide whether to "minimize the risks of long-term opioid use by discontinuing opioids," because the patient is "not receiving a clear benefit."[12]

72.    Defendants also made misrepresentations to doctors, and to patients through doctors, in order to encourage increased opioid prescriptions. In part, Defendants falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious, because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.

73.    The 2016 CDC Guideline confirms the falsity of these aforementioned misrepresentations by Defendants. The CDC Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts (widely misunderstood by doctors to detect and deter abuse)—for improving outcomes related to overdose, addiction, abuse, or misuse. As a result, the CDC Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."[13]

---

[12] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, MORBIDITY & MORTALITY WKLY. Rep., Mar. 18, 2016, at 25 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.  (hereinafter "2016 CDC Guideline").
[13] *Id* at 28.

74.    To downplay the risk and impact of addiction and to make doctors feel more comfortable starting patients on opioids, various Defendants falsely claimed that opioid dependence can easily be addressed by tapering, and that opioid withdrawal is not a problem. The Defendants generally failed to disclose the increased difficulty of stopping opioids after long-term use.

75.    Defendants also deceptively minimized the significant symptoms of opioid withdrawal—which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremors, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction—and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet, the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limited" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days."[14] The CDC Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause and restart" tapers, depending on the patient's response.[15] Importantly, the CDC noted the absence of high-quality studies discussing the effectiveness of various tapering plans, yet Defendants consistently minimize difficulties associated with opioid withdrawal.

76.    Various Defendants also falsely claimed that doctors and patients could increase

---

[14] *Id.* at 24.
[15] *Id.* at 26.

opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain, because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance, and lower dosages did not provide pain relief.

77.    As confirmed by the FDA and CDC, these claims conflict with available scientific evidence.  As the CDC explained in its 2016 Guideline, the "benefits of high-dose opioids for chronic pain are not established," while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[16]  More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[17]  The CDC adds that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages."  Accordingly, the CDC advises doctors to avoid increasing dosages above 90 morphine milligram equivalents per day. These findings reinforced earlier findings announced by the FDA.

78.    Finally, Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse.

79.    These numerous, longstanding misrepresentations of the risks of long-term opioid use successfully convinced doctors and patients to discount those risks.

**Defendants Grossly Overstated the Benefits of Chronic Opioid Therapy.**

80.    Various Defendants also persuaded doctors and patients that there was a significant upside to long-term opioid use, thus encouraging opioid prescriptions as the proper treatment for

---

[16] *Id.* at 22-23.
[17] *Id*. at 23-24.

chronic pain. Various Defendants falsely and misleadingly touted the benefits of long-term opioid

use and falsely and misleadingly suggested that these benefits were supported by scientific

evidence.  Not only have these Defendants failed to correct these false and deceptive claims, they

continue to make them today.

81.    Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there

is no good evidence that opioids improve pain or function with long-term use, and ... complete

relief of pain is unlikely."[18]  The CDC reinforced this conclusion throughout its 2016 Guideline:

a.  "No evidence shows a long-term benefit of opioids in pain and function versus no
    opioids for chronic pain with outcomes examined at least 1 year later ...."[19]

b.  "Although opioids can reduce pain during short-term use, the clinical evidence
    review found insufficient evidence to determine whether pain relief is sustained and
    whether function or quality of life improves with long-term opioid therapy."[20]

c.  "Evidence is limited or insufficient for improved pain or function with long-term
    use of opioids for several chronic pain conditions for which opioids are commonly
    prescribed, such as low back pain, headache, and fibromyalgia."[21]

82.    Defendants also falsely and misleadingly emphasized or exaggerated the risks of

competing products like NSAIDs (nonsteroidal anti-inflammatory drugs), so that doctors and

patients would, instead, use opioids to treat chronic pain. Once again, these misrepresentations by

Defendants contravene pronouncements by, and guidance from, the FDA and CDC based on the

scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids

in 2016, to state that opioids should only be used as a last resort "in patients for which alternative

treatment options" like non-opioid drugs "are inadequate."  The 2016 CDC Guideline states that

NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and

---

[18] *Id.* at 20.
[19] *Id.* at 15.
[20] *Id.* at 18.
[21] *Id.* at 18-19.

lower back pain.[22]

83.    Various Defendants misleadingly promoted their opioids as:

- being unique among opioids in providing 12 continuous hours of pain relief with one dose, despite knowing that some opioids provide strong initial responses, but provide little or no pain relief at the end of the dosing period. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This makes OxyContin more dangerous, because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence; and

- marketing opioids for chronic pain, even though the FDA expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Upon information and belief, both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither drug is approved for, or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events." The FDA also issued a Public Health Advisory in 2007, emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.[23]

---

[22] *Id*. at 12.
[23] See U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora* (fentanyl buccal tablets) (Sept. 26, 2007),

84.    Various Defendants' deceptive marketing gave doctors and patients the false impression that opioids were not only safe and effective for treating chronic pain but were also approved by the FDA for such uses.

85.    Various Defendants unlawfully and unfairly failed to report or address illicit and unlawful prescribing of their drugs, despite knowing about it for years. Upon information and belief, various Defendants' sales representatives have maintained a database of doctors suspected of inappropriately prescribing their drugs. Rather than report these doctors to state medical boards or law enforcement authorities or cease marketing to them, they used the list to demonstrate the high rate of diversion of OxyContin (the same OxyContin promoted as less addictive) in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug.

86.    Various Defendants have been cited for failure to set up an effective system for identifying and reporting suspicious prescribing. These Defendants: failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct caused them to be placed on a no-call list.

87.    Various Defendants also targeted vulnerable patient populations who tend to suffer from chronic pain (e.g., elderly and veterans). Defendants targeted these vulnerable patients, even though the risks of long-term opioid use were significantly greater for them. For example, CDC Guidelines observe that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guidelines therefore conclude that there are special risks

---

https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

of long-term opioid use for elderly patients and recommends that doctors use additional caution and increased monitoring to minimize the risks of opioid use in elderly patients. The same holds true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

88.    Various Defendants made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain, even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, establishes that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. Upon information and belief, the FDA and other regulatory bodies warned Defendants of these adverse outcomes, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use, and that patients are suffering from addiction, overdoses, and death in alarming numbers.

**Defendants Fraudulently Concealed the Harms of Opioids.**

89.    Moreover, at all times relevant to this Complaint, various Defendants took steps to avoid detection and fraudulently concealed their deceptive marketing and unlawful, unfair, and fraudulent conduct by funding and working through third-parties like Front Groups and KOLs who appeared to be credible, objective individuals and organizations.

90.    Various Defendants manipulated their promotional materials and the scientific literature to provide the illusion of legitimacy and to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Defendants also distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.

91.    Because Defendants successfully concealed from the medical community, patients,

and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts, Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them.

92.    Defendants' deceptive marketing scheme caused, and continues to cause, doctors in Louisiana, The University of Louisiana System, and this judicial district, to prescribe opioids for chronic pain conditions. Absent Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. Defendants' deceptive marketing scheme also caused, and continues to cause, patients to purchase and use opioids for their chronic pain, believing they are safe and effective. Absent Defendants' deceptive marketing scheme, far fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

93.    The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the United States, Louisiana, The University of Louisiana System, and this judicial district.

94.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[24] Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to

---

[24] Rose Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 MORBIDITY & MORTALITY WKLY. REP. 50 & 51, (Jan. 1, 2016) at 1378.

reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[25] Most opioid addiction begins with legitimately-prescribed opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful.

**Defendants Caused Specific Harm to the The University of Louisiana System and its Employees.**

95.     Defendants created a virtually limitless opioid market through false and deceptive advertising and other unlawful and unfair conduct, which significantly harmed Plaintiff and other communities throughout Louisiana, including in this judicial district. Defendants' success in extending the market for opioids to new patients and as a solution to treat chronic pain conditions created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[26] By 2011, the CDC declared prescription painkiller overdoses to be at epidemic levels. The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population. Moreover, the *New York Times* reported in September 2017 that the epidemic, which now claims over 60,000 lives a year, is now killing babies and toddlers, because these deadly opioids are "everywhere" and are often mistaken for candy.[27]  Meanwhile, opioid manufacturers and distributors collect billions of dollars in revenue from the addicted American public, while public entities experience tens of millions of dollars in injury caused by the reasonably foreseeable consequence of the prescription opioid addiction and epidemic.

96.     Local governmental actors, including Plaintiff, face a massive crisis in their

---

[25] *Id.*

[26] *See*, Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. ENG. J. MED. 241 (2015).

[27] Julie Turkewitz, *'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims*, N.Y. TIMES, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

struggle to deal with this ever-expanding epidemic of opioid misuse and addiction. It is a serious national crisis that affects public health as well as social and economic welfare.[28] Upon information and belief, the economic burden alone is $78.5 billion per year, and it includes healthcare costs, lost productivity, addiction treatment, and criminal justice expenses. Some of the repercussions for individuals include job loss, lost custody of children, physical and mental health problems, homelessness, and incarceration.

97.    Further, despite strict federal regulation of prescription drugs, local law enforcement agencies are faced with increased diversion from legitimate sources for illicit purposes, including: doctor shopping; forged prescriptions; falsified pharmacy records; employee theft from their place of employment; and a growing trend of crimes against pharmacies, including robbery and burglary.

**Defendants Knew, or Should Have Known, of the Consequences of their Dangerous and Illicit Conduct.**

98.    Defendants knew, or should have known, about the harms their wrongful conduct caused. Defendants closely monitored their sales and the prescribing habits of doctors. Defendants also monitored government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. They knew and intended that their misrepresentations would persuade doctors to prescribe, and patients to use, their opioids for chronic pain.

99.    Defendants' deceptive messages tainted virtually every source doctors could rely on for information, and it prevented them from making informed treatment decisions. Defendants were also able to harness and hijack what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of the compassionate practicing of

---

[28]    Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugsabuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, MMWR MORB MORTAL WKLY REP. 2016;65, doi:10.15585/mmwr.mm655051e1).

medicine. Defendants touted their products as medical breakthroughs and preyed upon doctors wanting to believe they were giving patients the most modern and safe care available.

100.    Defendants' conduct in promoting opioid use has had a severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction, overdose, and death from illicit drugs such as heroin.  The costs are borne by Plaintiff and other governmental entities.  These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, and burying the dead, among others.

101.    The burdens imposed upon Plaintiff are not the normal or typical burdens of governmental programs and services.  Rather, these are extraordinary costs and losses that are directly related to Defendants' illegal actions. Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

102.    The University of Louisiana System has incurred and continues to incur significant costs for treatment of opioid use and dependence.

**Distributor Defendants' Unlawful Distribution of Opioids.**

103.    The Distributor Defendants owe a duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74) and Louisiana law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from the State of Louisiana, including The University of Louisiana System and this judicial district, as well as those orders the Distributor Defendants knew or should have known were likely to be diverted into the State of Louisiana, including The University of Louisiana System and this judicial district. The foreseeable harm is the unlawful diversion of prescription opioids for non-medical purposes.

104.    The unlawful diversion of prescription opioids is a direct and proximate cause of

the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality in the State of Louisiana, The University of Louisiana System, and this judicial district. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover.

105.    The opioid epidemic in Louisiana, including in The University of Louisiana System and this judicial district, remains an immediate hazard to public health and safety and is a temporary and continuous public nuisance that remains unabated.

106.    The Distributor Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

107.    Opioids are a controlled substance and, as "Schedule II" drugs, are categorized under federal and Louisiana law as dangerous drugs with a high potential for abuse, which may lead to severe psychic or physical dependence.

108.    As manufacturers and/or distributors of controlled substances, each Manufacturer Defendant and each Distributor Defendant was required under the Louisiana Administration Code, Title 46, Pt LIII, § 2705(A), to obtain a Controlled Dangerous Substance License. Each Manufacturer Defendant and each Distributor Defendant, as a holder of a Controlled Dangerous Substance License, has the following duties: (1) to comply with all federal and state laws and regulations relating to controlled substances to provide effective controls and procedures to guard against theft or diversion of controlled substances; (2) to design and operate a system to disclose to the Manufacturer Defendant suspicious orders of controlled substances; (3) to inform the relevant Field Division Office of the DEA, or its successor, of suspicious orders—including orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency—when discovered by the Manufacturer Defendant; (4) to maintain records and file reports; (5) to report whether missing controlled substances are likely candidates for diversion;

and (6) to report local trends and other indicators of the diversion potential of missing controlled substances. *Id.* at §§ 2711, 2713, 2715(C)(2), 2731, 2737(D)(5&6).

109.    Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act. *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Those requirements are adopted and incorporated into Louisiana law, as set forth above.

110.    Each Distributor Defendant has an affirmative duty under federal and Louisiana law to act as a gatekeeper guarding against the diversion of the highly-addictive, dangerous opioid drugs. Federal law requires that distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1). Louisiana incorporates these requirements, as set forth above.

111.    Federal regulations, incorporated by Louisiana law, similarly impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

112.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency, or orders deviating substantially from a normal pattern. *See* 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order should be reported as suspicious.

Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the entirety of the wholesale distributor's customer base, as well as the patterns throughout the relevant segment of the wholesale distributor industry.

113.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. Regardless, all suspicious orders must be reported.

114.    A distributor, in addition to reporting suspicious orders, has a responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels.

115.    Defendants have statutory and regulatory duties to maintain effective controls against diversion, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and to report suspicious orders.

116.    Nonetheless, each of the Distributor Defendants sold prescription opioids to retailers in the State of Louisiana, The University of Louisiana System, and this judicial district, and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to and within the State of Louisiana, including The University of Louisiana System and this judicial district.

117.    Each Distributor Defendant owes a duty: to monitor and detect suspicious orders of prescription opioids; to investigate and refuse suspicious orders of prescription opioids; to report

suspicious orders of prescription opioids; and to prevent the diversion of prescription opioids into illicit markets in the State of Louisiana, including The University of Louisiana System and this judicial district.

118.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for non-medical purposes and subsequent plague of opioid addiction, as well as abuse, addiction, morbidity, and mortality in State of Louisiana, including The University of Louisiana System and this judicial district, and the damages caused thereby.

119.    The Distributor Defendants also failed to report to the federal and state authorities, including the DEA, suspicious orders originating from the State of Louisiana, including The University of Louisiana System and this judicial district, or which the Distributor Defendants knew were likely to be diverted to the State of Louisiana, The University of Louisiana System, and this judicial district.

120.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, and/or orders of unusual frequency in the State of Louisiana, including The University of Louisiana System and this judicial district, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State of Louisiana, including The University of Louisiana System and this judicial district.

121.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates originating from the State of Louisiana, including The University of Louisiana System and this judicial district, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State of Louisiana, including The University of Louisiana System and this judicial district.

122.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and

industrial channels.

123.    The Distributor Defendants breached their duty to design and operate a system to disclose to the registrant suspicious orders of controlled substances and failed to inform the authorities, including the DEA, of suspicious orders when discovered, in violation of their duties under federal and state law.

124.    The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific, and industrial channels.

125.    The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Louisiana law as well as constituting negligence per se.

126.    The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal and state law that are required to legally acquire and maintain a license to distribute prescription opiates.

127.    The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

128.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities, demonstrate wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

**The Distributor Defendants have sought to avoid, and have misrepresented their compliance with, their legal duties.**

129.    The Distributor Defendants have repeatedly misrepresented their compliance with

their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

130.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

131.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.  Meanwhile, the opioid epidemic rages unabated in the United States, in the State of Louisiana, The University of Louisiana System, and in this judicial district.

132.    The wrongful actions and omissions of the Distributor Defendants caused the diversion of opioids and are a substantial contributing factor to and/or proximate cause of the opioid crisis.

133.    The Distributor Defendants abandoned their duties imposed under federal and state law, took advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State of Louisiana, including The University of Louisiana System and this judicial district.

**The Manufacturing Defendants unlawfully failed to monitor, report, and prevent suspicious orders, and thereby prevent diversion.**

134.    The same legal duties to prevent diversion and to monitor, report, and prevent suspicious orders of prescription opioids incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under Louisiana and federal law.

135.    Under Louisiana and federal law, the Manufacturer Defendants were required to comply with substantially the same licensing and permitting requirements as the Distributor Defendants and the same rules regarding prevention of diversion and reporting suspicious orders.

136.    Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture Schedule II controlled substances, like prescription opioids. See 21 U.S.C. § 823(a).  The registration requires:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes. 21 USCA § 823(a)(1)(emphasis added).

137.    Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 1C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section

1008 of the Act (21 U.S.C. 823 or 958").

138.    Each Manufacturer Defendant, like each Distributor Defendant, has duties under Louisiana Administration Code Title 46, as described above.

139.    Like the Distributor Defendants, the Manufacturer Defendants breached their duties under federal and state law.

140.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. Upon information and belief, various Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume, and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew—just as the Distributor Defendants knew—the volume, frequency, and pattern of opioid orders being placed and filled. Further, upon information and belief, the Manufacturer Defendants factored this information into the payment structure for the opioids provided to the opioid distributors.

141.    Federal statutes and regulations—and Louisiana law incorporating these requirements—are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 U.S.C.A. § 823(a)(1).

142.    Through, *inter alia*, the charge back data, the Manufacturer Defendants could monitor suspicious orders of opioids.

143.    The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids, as required by law.

144.    The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

145.    The Manufacturer Defendants have misrepresented their compliance with federal and state law.

146.    The Manufacturer Defendants enabled the supply of prescription opioids to suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids ultimately into the black market.

147.    The wrongful actions and omissions of various Manufacturer Defendants have been a substantial contributing factor to and/or proximate cause of the opioid crisis and enabled the unlawful diversion of opioids into the State of Louisiana, including The University of Louisiana System and this judicial district.

**Defendants' unlawful conduct and breaches of legal duties caused the harm alleged herein and substantial damages.**

148.    As the Manufacturer Defendants' efforts to expand the market for opioids increased, so have the rates of prescriptions and the sale of their products—and the rates of opioid-related substance abuse, hospitalization, and death among the people of the State of Louisiana, The University of Louisiana System, and this judicial district. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like The University of Louisiana System and this judicial district, fueling the epidemic.

149.    There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

associated adverse outcomes.

150.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.  This problem has existed and continues to exist in the State of Louisiana, in The University of Louisiana System, and in this judicial district.

151.    The epidemic is directly related to the increasingly widespread misuse of powerful opioid pain medications.

152.    The increased abuse of prescription painkillers, along with growing sales, has contributed to a large number of overdoses and deaths, including in the State of Louisiana, in The University of Louisiana System, and in this judicial district.

153.    The opioid epidemic has escalated in the State of Louisiana, The University of Louisiana System, and in this judicial district, with devastating effects, such as widespread opiate-related substance abuse, hospitalization, and death that mirrors Defendants' increased distribution of opiates.

154.    Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opiates, like heroin, the massive distribution of opioids to The University of Louisiana System, and areas from which such opioids are being diverted into The University of Louisiana System, has caused the hazards to public health and safety, such as heroin addiction and heroin-related deaths.

155.    Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for non-medical purposes into the State of Louisiana, The University of Louisiana System, and this judicial district.

156.    The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality in the State of Louisiana, The University of Louisiana System, and this judicial district. This diversion and the epidemic are direct causes of foreseeable harms incurred by The University of Louisiana System.

157.    Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages which Plaintiff has incurred and continues to incur, including: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, and patrons and/or residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs associated with increased healthcare and healthcare insurance; (3) costs regarding disability payments; (4) costs associated with special education means, including, but not limited to, special programs for students, employees, and patrons and/or residents with opioid-related learning disabilities, or for students, employees, and patrons and/or residents in need of psychological counseling due to opioid-related crisis; (5) costs associated with providing care for students, employees, and patrons and/or residents suffering from opioid-related disability or incapacitation; (6) costs associated with increased security in all campuses and/or facilities of The University of Louisiana System; and (7) treble damages. These damages have been suffered, and continue to be suffered directly, by Plaintiff, and for which Plaintiff seeks relief, as alleged herein.  Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

158.    Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care,

additional therapeutic and prescription drug purchases, and other treatments for students, employees, and patrons and/or residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs associated with increased healthcare and healthcare insurance; (3) costs regarding disability payments; (4) costs associated with special education means, including, but not limited to, special programs for students, employees, and patrons and/or residents with opioid-related learning disabilities, or for students, employees, and patrons and/or residents in need of psychological counseling due to opioid-related crisis; (5) costs associated with providing care for students, employees, and patrons and/or residents suffering from opioid-related disability or incapacitation; (6) costs associated with increased security in all campuses and/or facilities of The University of Louisiana System; and (7) treble damages. These damages have been suffered, and continue to be suffered directly, by Plaintiff.

159.    Plaintiff also seeks economic damages from the Defendants to pay for the cost to abate the epidemic created by Defendants' wrongful and/or unlawful conduct, and to permanently eliminate these hazards to public health and safety and abate the public nuisances caused thereby.

160.    To eliminate the hazard to public health and safety, and abate the public nuisance, a multifaceted, collaborative public health and law enforcement approach is urgently needed. Such a comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients suffering pain.

161.    These community-based problems require community-based solutions that have been limited by budgetary constraints at the local, state, and federal levels.

162.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon The University of Louisiana System.

**National Retail Pharmacies had a duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances.**

163.    The National Retail Pharmacies had a duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1306.04(a).

164.    The DEA provided extensive guidance to the National Retail Pharmacies concerning their duties to the public, including how to identify suspicious orders and other evidence of diversion.

165.    The National Retail Pharmacies had a duty to identify: orders of unusually large size; orders that were disproportionately large in comparison to the population of a community served by the pharmacy; orders that deviate from a normal pattern; orders of unusual frequency and duration; prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; prescriptions that look "too good" or where the prescriber's handwriting is too legible; prescriptions with quantities or doses that differ from usual medical usage; prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; photocopied prescriptions; or prescriptions containing different handwriting.

166.    The National Retail Pharmacies had a duty to detect other indications of diversion through data gathered, consolidated, and analyzed by the National Retail Pharmacies themselves.

167.    The National Retail Pharmacies had a duty to contact the local Board of Pharmacy and DEA upon finding evidence of prescription diversion.

168.    The National Retail Pharmacies did not comply with their duties and knowingly permitted widespread diversion of opioids.

169.    The National Retail Pharmacies inhibited compliance with their duty to prevent diversion of opioid prescriptions by adopting performance metrics and prescription quotas for their retail stores.

170.    The National Retail Pharmacies failed to adequately train their pharmacists and pharmacy technicians on how to properly handle prescriptions for opioids, including in detection of improper prescribing and diversion of opioids.

171.    The National Retail Pharmacies failed to adequately employ available data to identify doctors who were writing suspicious volumes of prescriptions and/or prescriptions of suspicious amounts of opioids, or to detect diversion.

172.    The National Retail Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales over time; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

173.    The National Retail Pharmacies failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions.

174.    The National Retail Pharmacies failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

175.    The National Retail Pharmacies were, or should have been, aware of the excessive quantity of opioids being distributed and dispensed by them.

176.    The National Retail Pharmacies knew of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids.

177.    The National Retail Pharmacies have been repeatedly penalized for their illegal prescription opioid practices.

178.    CVS has paid fines in the tens of millions as the result of investigations by the DEA and the United States Department of Justice ("DOJ") regarding improper practices regarding the dispensing of opioids.

179.    CVS has been forced to enter into a settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

180.    Walgreens also has been penalized in the tens of millions for violations of the CSA, including violations involving opioids.

181.    Walgreens has settled with a number of state attorneys general over the dispensing of opioid prescriptions.

182.    Walgreens knowingly failed to meet its duties under the CSA, even when Walgreens became aware of dramatic increases in the dispensing of opioids and high numbers of opioids dispensed in proportion to the population.

183.    Rite Aid has also been fined millions for violations of the CSA, after multi-jurisdictional investigations by the DOJ, including regarding prescription opioids.

184.    State and federal drug diversion prosecutions have involved prescription opioid pills procured from National Retail Pharmacies.

185.    The National Retail Pharmacies repeatedly and consistently violated their legal duties under the CSA and other laws and regulations that govern the distribution and dispensing of prescription opioids.

186.    The National Retail Pharmacies knew, or reasonably should have known, about the disproportionate flow of opioids into Louisiana and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were apparently for illicit supply and diversion. Combined with additional information from news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area, the National Retail Pharmacies knew, or should have known, that they were abetting the illegal distribution of controlled substances.

187.    The National Retail Pharmacies knew, or reasonably should have known, about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in Louisiana and The University of Louisiana System where Plaintiff is located.

188.    The National Retail Pharmacies were well aware that their distribution and dispensing activities fell far short of their legal duties.

189.    The National Retail Pharmacies' failure to effectively prevent diversion and to monitor, report, and prevent suspicious orders contributed significantly to the opioid crisis by enabling and failing to prevent the diversion of opioids.

190.    Prescription opioids dispensed by the National Retail Pharmacies migrated between cities, parishes, and states. Prescription data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion of opioids dispensed by the National Retail Pharmacies in each jurisdiction.

191.    The National Retail Pharmacies engaged in actions, as described above, which are unethical, oppressive, unscrupulous, and substantially injurious to Petitioner and to the public.

192.    The acts and omissions of the National Retail Pharmacies, as enumerated above, constitute unfair or deceptive acts or practices in the conduct of trade or commerce which have been declared unlawful by Louisiana statutes and jurisprudence.

193.    The National Retail Pharmacies' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the public, Petitioner's community, and Petitioner.

194.    The National Retail Pharmacies' unfair trade practices specifically include, but are not necessarily limited to, the following:

(a)    The practice of not monitoring for suspicious orders of prescription opioids;
(b)    The practice of not detecting suspicious orders of prescription opioids;
(c)    The practice of not investigating suspicious orders of prescription opioids;
(d)    The practice of filling, or failing to refuse fulfillment of, suspicious prescriptions for opioids;
(e)    The practice of not reporting suspicious prescriptions for opioids;
(f)    The practice of rewarding increases in prescription opioid sales; and/or
(g)    The practice of falsely misrepresenting to governmental entities and the public that the National Retail Pharmacies were complying with their legal obligations.

195.    Because of the dangerously addictive nature of these drugs, the National Retail Pharmacies' dispensing practices unlawfully caused the opioid epidemic plaguing Petitioner's community.  The National Retail Pharmacies had a non-delegable duty to guard against and prevent the diversion of prescription opioids.

196.    The National Retail Pharmacies are thus in violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et. seq.*

197.    Petitioner seeks all remedies available under Louisiana Revised Statutes 51:1401, *et seq.*, including injunctive relief, compensatory damages, applicable civil penalties, treble

damages, attorney's fees, and other appropriate relief.

**Statutes of Limitations and Prescriptions are tolled, and Defendants are estopped from asserting statutes of limitation and prescription defenses.**

198.    Plaintiff contends it continues to suffer harm from the continual unlawful actions by the Defendants.

199.    The ongoing tortious and unlawful conduct by the Defendants constitute continuing violations of federal and state law causing a distinct injury instead of continual ill effects from an original violation. The effects of Defendants' violative acts are cumulative. The damages have not occurred all at once, but have continued to occur after each violation, and have increased as time progresses. The tort is not completed, nor have all the damages been incurred until the wrongdoing ceases, and the wrongdoing and unlawful activity by Defendants have, by no means, ceased or even decreased. The public nuisance remains unabated.

200.    Defendants are equitably estopped from relying upon a statute of limitations or prescription defense, to the extent any such defense even applies to Plaintiff's claims, because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State of Louisiana and The University of Louisiana System, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State of Louisiana and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State of Louisiana and The University of Louisiana System, that they are working to curb the opioid epidemic.

201.    Upon information and belief, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, not only acknowledged that they understood their obligations under the law, but they affirmed that

their conduct was in compliance with those obligations, while this was clearly not the case.

202.    Upon information and belief, the Distributor Defendants also concealed and prevented discovery of information, including data from the ARCOS database, which will confirm their identities and the extent of their wrongful and illegal activities.

203.    Various Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudo-addiction" and promoted it to an unsuspecting medical community. Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community, consumers, the State of Louisiana, and the The University of Louisiana System were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs they were aggressively pushing in the State of Louisiana, The University of Louisiana System, and this judicial district.

204.    Defendants intended that their actions and omissions would be relied upon, including by Plaintiff. Plaintiff did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

205.    The Plaintiff reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

206.    Plaintiff's claims are further subject to equitable tolling, including under the doctrine of *contra non valentum*, stemming from Defendants knowingly and fraudulently

concealing the facts alleged herein.

207.    The purposes of the statutes of limitations and prescription periods are satisfied, because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims described herein, which Defendants knowingly concealed and continue their effort to conceal.

208.    In light of their statements to the media, in legal filings, and in settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive in that they consciously concealed the schemes set forth herein.

209.    Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions, because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims, absent any fault or lack of diligence on its part.

## LEGAL CAUSES OF ACTION

### COUNT I
### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANZIATIONS ACT PURSUANT TO 18 U.S.C. § 1961, *et seq.* (Against Defendants Purdue, Cephalon, Janssen, Endo, and Mallinckrodt ("Marketing Defendants")

210.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges, as follows.

211.    Plaintiff brings this Count against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, for purposes of this Count, the "RICO Marketing Defendants").

212.    Through the use of "Front Groups" and a well-constructed scheme, the RICO Marketing Defendants worked toward the common purpose of establishing and running an Opioid

Market Enterprise. Specifically, the RICO Marketing Defendants: disseminated publications that supported their marketing scheme; established and supported CME programs controlled and/or funded by the RICO Marketing Defendants through the hiring and deployment of KOLs who were paid by the RICO Marketing Defendants to promote their message; and conducted "detailing" activities through the RICO Marketing Defendants' sales forces. The RICO Marketing Defendants conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the aforementioned Opioid Marketing Enterprise. These efforts furthered the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use by convincing them that each of the false propositions alleged earlier were true. In so doing, each of the RICO Marketing Defendants knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1961(c) and (d). The Opioid Marketing Enterprise alleged above is an association-in-fact enterprise that consists of the RICO Marketing Defendants (Purdue, Cephalon, Janssen, Endo and Mallinckrodt), various Front Groups (APS, AGS, FSMB, ACPA, ASPE, NPF, PPSG, APF), and numerous KOLs.

213.   Each of the RICO Marketing Defendants and the other members of the Opioid Marketing Enterprise conducted and participated in the acts of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions and increase the market for opioids.

214.    Specifically, the RICO Marketing Defendants each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things: (a) funding, creating, editing, and distributing publications that disseminated their false messages; (b) funding KOLs to further promote their false messages; (c) funding, creating, editing, and distributing CME programs to advance their false messages; and (v) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians and, in particular, at physicians lacking the expertise of pain care specialists (a practice known as sales detailing).

215.    Each of the Front Groups helped disguise the role of RICO Marketing Defendants by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials, a body of biased and unsupported scientific "literature," and "treatment guidelines" that promoted the RICO Marketing Defendants' false messages.

216.    KOLs were physicians chosen and paid by each of the RICO Marketing Defendants to influence their peers' medical practice by promoting the Marketing Defendants' false messages through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the RICO Marketing Defendants' role in the enterprise and the enterprise's existence.

217.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO Marketing Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Marketing Defendants; (d) was characterized by interpersonal

relationships between and among each member of the Opioid Marketing Enterprise, including between the RICO Marketing Defendants and each of the Front Groups and KOLs; and (e) had sufficient longevity for the enterprise to pursue its purpose and function as a continuing unit.

218.    Further, each of the RICO Marketing Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts described herein and that are itemized in the RICO laws, and they did so in violation of the RICO law at 18 U.S.C. 1962(b). During this time, the RICO Defendants also associated with a RICO enterprise of individuals who were associated, in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

219.    Likewise, the RICO Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said aforementioned RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1961, *et seq*.

220.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized herein in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. § 1962(c) *et seq*.

221.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

222.    The RICO Marketing Defendants' racketeering activities have resulted in direct and foreseeable harm to Plaintiff in the form of substantial losses of money and property.  Plaintiff's injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference,

include:

    a.  Costs for providing healthcare and medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, patrons, residents, and/or patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    b.  Costs associated with increased healthcare and healthcare insurance;

    c.  Costs regarding disability payments;

    d.  Costs associated with special education means, including, but not limited to, special programs for students, employees, patrons, residents, and/or patients with opioid-related learning disabilities, or for students, employees, patrons, residents, and/or patients in need of psychological counseling due to opioid-related family crisis;

    e.  Costs associated with providing care for students, employees, patrons, residents, and/or patients suffering from opioid-related disability or incapacitation;

    f.  Costs associated with increased security in all facilities of The University of Louisiana System; and

    g.  Losses due to the increased costs per student due to the opioid crisis.

223.    Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*: actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; pre- and post-judgment interest; and all of the relief sought as the Court deems just and applicable.

## COUNT II
**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1961, *et seq.* (Against Distributor Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Distributor Defendants"))**

224.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs, as if fully set forth herein, and specifically repeat and re-allege the allegations under the First Cause of Action concerning RICO liability.

225.    Based on the aforementioned acts and inactions, the RICO Distributor Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961, *et seq.*

226.    All RICO Distributor Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. § 1962(d).

227.    Plaintiff further alleges that the RICO Distributor Defendants did commit two (2) or more of the offenses itemized above in a manner in which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(d) (prohibited activities).

228.    The RICO Distributor Defendants together formed an association-in-fact enterprise for the purpose of increasing quota for and profiting from the increased volume of opioid sales in the United States.

229.    The RICO Distributor Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

230.    The RICO Distributor Defendants hid from the general public and suppressed and/or ignored warnings from third parties about the reality/reporting of suspicious orders – leading to the diversion of hundreds of millions of doses of prescription opioids into the illicit market for street use.

231.    The RICO Distributor Defendants acted with knowledge and intent to achieve the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

232.    Indeed, for the RICO Distributor Defendants' fraudulent scheme to work, each of

the RICO Distributor Defendants had to agree to implement similar tactics regarding manufacturing and distribution of prescription opioids and refusing to report suspicious orders.

233.    As described herein, the RICO Distributor Defendants engaged in a pattern of racketeering through continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly-addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

234.    The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff and were committed or cause to be committed by the RICO Distributor Defendants through their participation in and in furtherance of the fraudulent scheme to supply opioids in contradiction to public health and safety.

235.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

236.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

237.    It was foreseeable that the RICO Distributor Defendants' actions directly and proximately harm Plaintiff.

238.    The last racketeering incident occurred within five years of the omission of a prior incident of racketeering.

239.    The RICO Distributor Defendants' racketeering activities have resulted in direct

and foreseeable harm to Plaintiff in the form of substantial losses of money and property. Plaintiff's injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

    a.  Costs for providing healthcare and medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, patrons, residents, and/or patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    b.  Costs associated with increased healthcare and healthcare insurance;

    c.  Costs regarding disability payments;

    d.  Costs associated with special education means, including, but not limited to, special programs for students, employees, patrons, residents, and/or patients with opioid-related learning disabilities, or for students, employees, patrons, residents, and/or patients in need of psychological counseling due to opioid-related family crisis;

    e.  Costs associated with providing care for students, employees, patrons, residents, and/or patients suffering from opioid-related disability or incapacitation;

    f.  Costs associated with increased security in all facilities of The University of Louisiana System; and

    g.  Losses due to the increased costs per student due to the opioid crisis.

240.    Plaintiff seeks all legal and equitable relief, as allowed by law, including, *inter alia*: actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions, and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; pre- and post-judgment interest; and all of the relief sought in the First Claim for Relief, as the Court deems just and applicable.

## COUNT III
## PUBLIC NUISANCE

241.    Plaintiff incorporates, by reference, all other paragraphs of this Complaint, as if fully set forth herein, and further alleges, as follows.

242.    Defendants' unlawful actions have created a public nuisance under Louisiana law,

and Plaintiff brings an action for abatement of that nuisance. *See* La. R.S. 13:4712 (granting the St Mary Parish School Board's governing authority the right to petition for injunction or order of abatement); La. R.S. 4711(A)(4)(b) (The illegal manufacture, sale or distribution of, or possession with intent to manufacture, sell, or distribute, a controlled dangerous substance as defined by R.S. 40:961 or of drug paraphernalia as defined by R.S. 40:1021.).

243.    Plaintiff alleges that Defendants' wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance.

244.    Defendants intentionally, unlawfully, recklessly, and negligently manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to The University of Louisiana System, resulting in addiction and abuse, an elevated level of crime, death and injuries to the students, employees, patrons and/or residents of The University of Louisiana System, a higher level of fear, discomfort, and inconvenience to the students, employees, patrons and/or residents of The University of Louisiana System, and direct costs to The University of Louisiana System.

245.    Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct is illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

246.    Defendants' conduct in unlawfully distributing and selling prescription opioids, or causing such opioids to be distributed and sold, when Defendants know, or reasonably should know, such opioids will be diverted, possessed, and/or used unlawfully in the State of Louisiana,

including within The University of Louisiana System and this judicial district, is of a continuing nature.

247.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

248.    A violation of any rule or law controlling the distribution of a drug of abuse in The University of Louisiana System and the State of Louisiana is a public nuisance.

249.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by federal and state law.

250.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be unlawfully distributed and possessed in the State of Louisiana and in The University of Louisiana System will be diverted, leading to abuse, addiction, crime, and public health costs.

251.    Because of the continued use and addiction caused by these unlawfully distributed opioids, the public will continue to fear for its health, safety, and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

252.    Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety, and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

253.    Defendants are aware, or should be aware, of the unreasonable interference that their conduct has caused for The University of Louisiana System Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law.

254.    Defendants' conduct in marketing, distributing, and selling prescription opioids,

which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to students, employees, patrons and/or residents in The University of Louisiana System and otherwise significantly and unreasonably interfere with public health, safety, and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

255.    It is reasonably foreseeable to the Defendants that their conduct will cause deaths and injuries to residents in The University of Louisiana System, and will otherwise significantly and unreasonably interfere with public health, safety, and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

256.    The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in The University of Louisiana System not only causes deaths and injuries, but also creates a palpable climate of fear among residents in The University of Louisiana System where opioid diversion, abuse, and addiction are present, and where diverted opioids tend to be used frequently.

257.    Stemming the flow of illegally-distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries, and make The University of Louisiana System a safer place to live.

258.    Defendants' conduct is a direct and proximate cause of deaths and injuries to The University of Louisiana System, costs borne by The University of Louisiana System, and a significant and unreasonable interference with public health, safety, and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

259.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety, and welfare of the residents of The University of Louisiana System, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

260.    Defendants created this nuisance of the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in The University of Louisiana System.  However, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting, and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship, and failed to halt, suspicious orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading.  Such actions were inherently dangerous.

261.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that, where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, the opioids would be diverted and create an opioid abuse nuisance in The University of Louisiana System.

262.    Defendants acted with actual malice, because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

263.    As a direct result of Defendants' conduct, The University of Louisiana System has suffered actual injury and damages, including, but not limited to, significant expenses for health services, health insurance, disability payments, other services, special education programs, increased security, and costs related to opioid addiction treatment and overdose prevention.

264.    The Plaintiff further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions.

265.    The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gatekeeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to The University of Louisiana System.

266.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including, *inter alia*: injunctive relief; restitution; disgorgement of profits; compensatory, treble, and punitive damages; all damages allowed by law to be paid by the Defendants; attorney's fees and costs; and pre- and post-judgment interest.

## COUNT IV
## VIOLATIONS OF LOUISIANA RACKETEERING ACT
### (LSA-R.S.  § 15:1351 *et seq.*)

267.    Plaintiff incorporates, by reference, all other paragraphs of this Complaint as if fully set forth herein, and further alleges, as follows.

268.    Plaintiff brings this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal Health, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO

Defendants").

269.    The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants operated as an association in fact and included unlawful, as well as lawful, enterprises as defined by LSA-R.S. § 15:1352(B).

270.    Section 15:1353 makes it "unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity," and it is unlawful for any person to "conspire or attempt to violate any of the provisions" of LSA-R.S. § 15:1353.

271.    The term "enterprise" is defined as including "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. § 15:1352(B).

272.    For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. Yet, to do just that, the RICO Defendants violated their duties: (1) to comply with all federal and state laws and regulations relating to controlled substances (2) to provide effective controls and procedures to guard against theft or diversion of controlled substances; (3) to design and operate a system to disclose to the Manufacturer Defendants suspicious orders of controlled substances; (4) to inform the Field Division Office of the DEA, or its successor, of suspicious orders—including orders of unusual size, orders deviating substantially from a normal

pattern, and orders of unusual frequency—when discovered by the Manufacturer Defendants; (5) to maintain records and file reports; (6) to report whether missing controlled substances are likely candidates for diversion; and (7) to report local trends and other indicators of the diversion of potentially missing controlled substances.

273.    Federal and Louisiana law governing the manufacture and distribution of Schedule II substances was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from legitimate channels of trade to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of controlled substances.

274.    Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.  As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers that, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA.  In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market that allowed them to generate obscene profits.

275.    Defendants' unlawful scheme occurred via an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants and was executed in perfect harmony by them. In particular, the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids,

and deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions of dollars in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market shares. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiff experienced millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated R.S. § 14:67 (Theft), R.S. § 40:967(A) (Manufacture; distribution of Schedule II controlled dangerous substances), R.S. § 14:230 (Money laundering), R.S. § 14:133 (Filing or maintaining false public records), and § 14:70:1 (Medicaid fraud), and Plaintiff is entitled to treble damages for its injuries under LSA-R.S. § 15:1356(E).

276.    Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of LSA-R.S. § 15:1352, through which the RICO Defendants conducted their pattern of racketeering activity in the State of Louisiana, including within The University of Louisiana System and this judicial district. Specifically, the Healthcare Distribution Alliance (the "HDA") is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, the HDA qualifies as an "enterprise," because it is a corporation and a legal entity.

277.    On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to this Count.

278.    Each of the RICO Defendants is a legal entity separate and distinct from the HDA, and the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

279.    The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are plead in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

### The Opioid Diversion Enterprise

280.    It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.

281.    At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits by disregarding their statutory duty to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity throughout the United States, including within the State of Louisiana, The

University of Louisiana System, and this judicial district, through this enterprise.

282.    The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has conducted business uninterrupted since its genesis. But, it was not until recently that United States and state regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

283.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) was characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

284.    The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their unlawful enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenue by violating state and federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The

goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate, and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

285.    Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

286.    Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, and different offices, roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

287.    The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum ("PCF"), the HDA, and through their contractual relationships.

288.    Not surprisingly, each of the RICO Defendants who stood to profit from fraudulently promoting prescription opioid use is a member of and/or participant in the PCF. At pertinent times, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (i.e., Allergan), and Teva (the parent company of Cephalon). Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise, but the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

289.    The Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted efforts that the PCF undertook on behalf of its members.

290.    The HDA led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in this Complaint, including Actavis (i.e., Allergan), Endo, Purdue, Mallinckrodt, and Cephalon were members of the HDA.  The HDA and each of the Distributor Defendants eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturer Defendants and Distributor Defendants at high executive levels.

291.    In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things: network one-on-one with manufacturer executives at HDA's members-only Business and Leadership Conference; network with HDA wholesale distributor members; host and sponsor HDA Board of Directors' events; participate on HDA committees, task forces, and working groups with peers and trading partners; and make connections. Membership in the HDA created interpersonal and ongoing organizational relationships between the Manufacturer Defendants and Distributor Defendants.

292.    The councils, committees, task forces, and working groups of the HDA provided the Manufacturer Defendants and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

293.    The RICO Defendants maintained their interpersonal relationships by working together, exchanging information, and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

294.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids. There exists an industry-wide practice whereby the manufacturers paid the distributors rebates and/or chargebacks on their prescription opioid sales. On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer Defendants and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. The Manufacturer Defendants used this information to direct the Distributor Defendants

on how to most effectively sell prescription opioids.

295.     The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Upon information and belief, the Manufacturer Defendants negotiated agreements whereby the Manufacturer Defendants installed security vaults for distributors in exchange for agreements to maintain minimum sales performance thresholds. Upon information and belief, these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

296.     Taken together, the interaction and length of the relationships between and among the Manufacturer Defendants and Distributor Defendants reflect a deep level of collusion and cooperation between two groups in a tightly-knit industry. The Manufacturer Defendants and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the PCF are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrate that the leaders of the RICO Defendants were in communication and cooperation.

297.     As described above, the RICO Defendants began working together as early as 2006 through the PCF and/or the HDA to promote the common purpose of their enterprise. Upon information and belief, the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## Conduct of the Opioid Diversion Enterprise

298.    At all times pertinent, the RICO Defendants exerted control over, and conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their federal and state obligations to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly-addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits.

299.    The RICO Defendants disseminated false and misleading statements to the public, claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

300.    The RICO Defendants disseminated false and misleading statements to the public, claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

301.    The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

302.    The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Upon information and belief, the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured.  Upon information and belief, the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

303.    The Manufacturer Defendants deceived the DEA to increase Aggregate Production Quotas year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been

properly investigated or reported by the RICO Defendants.

304. The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids. On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, and the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, and cancer treatment facilities, among others.   These questionnaires put the recipients on notice of suspicious orders.

305. The RICO Defendants refused to identify, investigate, and report suspicious orders to the DEA when they became aware of the suspicious orders, despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs, despite the DEA issuing final decisions against the Distributor Defendants for failure to report suspicious orders.

306. Defendants' scheme had a decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the state and federal governments' response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

307. The RICO Defendants worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA stayed high and ensured

that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase, or to decrease, the production quotas for prescription opioids due to diversion of suspicious orders.

308.    The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## COUNT V
## FRAUD
### (LA. CIV. CODE ART. 2315)

309.    Plaintiff incorporates, by reference, all previous allegations in the preceding paragraphs, as if fully set forth herein.

310.    Defendants violated their duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

311.    Specifically, Defendants' knowing deceptions include, but are not limited to:

a.    Misrepresentations overstating the benefits of, and evidence for, the use of opioids for chronic pain;

b.    Misrepresentations that the risk of long-term opioid use, especially the risk of addiction, were overblown;

c.    Misrepresentations that opioid doses can be safely and effectively increased until pain relief is achieved;

d.    Misrepresentations that signs of addition were "pseudoaddiction" and thus reflected undertreated pain, which should be responded to with *more* opioids;

e.    Misrepresentations that screening tools effectively prevent addiction;

  f. Misrepresentations concerning the comparative risks of NSAIDs and opioids;

  g. Misrepresentations that evidence supports the long-term use of opioids for chronic pain;

  h. Misrepresentations that chronic opioid therapy would improve patients' function and quality of life;

  i. Misrepresentations that withdrawal from opioids and/or opioid treatment is easily managed;

  j. Misrepresentations through the use of front groups who convey deceptive statements to the public and health care professionals;

  k. Defendants' creation of deceptive, misleading, and unsupported medical and popular literature, advertisements, training materials, and speaker presentations about opioids; and

  l. Such other misrepresentations and deceptions outlined and/or described above.

312. Defendants had a duty to not deceive Plaintiff, because they had in their possession unique material knowledge that was unknown or not knowable to Plaintiff, Plaintiff's agents, physicians, and the public.

313. As described above, Defendants engaged in repeated fraudulent acts and practices, thus committing fraud against Plaintiffs, pursuant to Louisiana Civil Code article 2315 (as defined in Louisiana Civil Code article 1953).

314. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*: injunctive relief; restitution' disgorgement of profits; compensatory and punitive damages; all damages allowed by law to be paid by Defendants; attorney's fees and costs; expenses of suit; and pre- and post- judgment interest.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (LA. CIV. CODE ARTS. 2315 and 2316)

315.    Plaintiff incorporates, by reference, all previous allegations in the preceding paragraphs, as if fully set forth herein.

316.    For reasons set forth above, Defendants made negligent misrepresentations to Plaintiff and others pursuant to Louisiana Civil Code articles 2315 and 2316. There existed, at all relevant times, a legal duty owed to Plaintiff by Defendants to accurately warn of the efficacy and side effects of opioid analgesic pain relievers. Defendants breached this duty, as set forth above. Plaintiff reasonably relied upon Defendants' representations. As an actual and proximate result of Defendants' misrepresentations, and Plaintiff's reasonable reliance thereof, Plaintiff has been damaged, as detailed above.

317.    Plaintiff is entitled to judgment against Defendants for restitution, attorney's fees, and costs for the losses incurred as a direct and proximate cause of Defendants' misrepresentations.

## COUNT VII
## REDHIBITION
### (LA. CIV. CODE ART. 2520 *et seq*.

318.    Plaintiff incorporates, by reference, all previous allegations in the preceding paragraphs, as if fully set forth herein.

319.    Pursuant to Louisiana Civil Code 2520, *et seq.*, through the manufacture, marketing, and sale of OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, Defendants warranted to the Plaintiff, Louisiana patients, medical assistance programs, and government payors (including Plaintiff) that OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora,

Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco were free of any redhibitory effects.

320.     By virtue of the acts alleged above, Defendants had reason to know that Plaintiff, patients, their insurers, public health care providers, prescribers, public entities, medical assistance programs, and government payors (including Plaintiff) were purchasing and using OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco for the treatment of unapproved indications or for ineffective treatment. Therefore, pursuant to La. C.C. art. 2520, Defendants warranted to the Plaintiff, Louisiana patients, their insurers, public health care providers, prescribers, public entities, medical assistance programs, and government payors that OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco were for those particular purposes.

321.     OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco contain redhibitory defects unknown and undiscoverable to Plaintiff. But for Defendants' false representations and omissions regarding unapproved indications and uses for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, Louisiana healthcare professionals would not have prescribed OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco for such unapproved indications and uses, Plaintiff would not have

purchased and/or paid for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco.

322.    The redhibitory defects existed at the time OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco were purchased and/or paid for by Plaintiff, and Plaintiff had no knowledge of the redhibitory defects when it paid for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, and it could not have reasonably discovered the hidden redhibitory defects in OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco.

323.    Defendants breached their warranty of redhibition, and as a direct result of this breach of warranty, Plaintiff has suffered and will continue to suffer damages.

324.    Pursuant to La. C.C. art. 2545, Defendants are liable to Plaintiff for the return of the price with interest from the time it was paid for, reimbursement of the reasonable expenses occasioned by the sale, and for damages, including any consequential damages for medical care and expenses related to the undisclosed adverse effects and side effects of OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targinio ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrodone, and Norco in a total amount to be determined at trial, as well as reasonable attorney fees to be set by the Court.

## COUNT VIII
## UNJUST ENRICHMENT
### (LA. CIV. CODE ART. 2298)

325.    Plaintiff incorporates, by reference, all previous allegations in the preceding paragraphs, as if fully set forth herein.

326.    Plaintiff asserts that, by receiving recoveries for overpayments/overcharges for prescriptions which were ultimately paid for by The University of Louisiana System, Defendants have been enriched without cause at the expense of Plaintiff. Pursuant to Louisiana Civil Code article 2298, Defendants are obligated to restore to Plaintiff the portion of any payments for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, opioid analgesic pain relievers attributable to prescriptions ultimately paid for by The University of Louisiana System.

327.    It would be inequitable for Defendants to be permitted to retain any of the overcharges for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, opioid analgesic pain relievers, derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

328.    Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

329.    Plaintiff has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

330.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

331.    These expenditures have helped sustain Defendants' business.

332.    Plaintiff has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution practices.

333.    Defendants were aware of these benefits, and their retention of the benefit is unjust.

334.    Plaintiff has paid for the cost of Defendants' externalities. and Defendants have benefited from those payments, because they allowed them to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, Defendants obtained enrichment they would not have otherwise obtained. The enrichment was without justification, and Plaintiff seeks a remedy provided by law.

335.    To the extent that Plaintiff has no adequate remedy at law, Defendants should be compelled to disgorge for the benefit of Plaintiff all unlawful or inequitable proceeds received by Defendants.

336.    Plaintiff alleges that, under La. C.C. art. 2298, Defendants have been unjustly enriched and, thus, Plaintiff is entitled to an award for costs, expenses, fees, and attorney's fees.

## COUNT IX
## UNFAIR TRADE PRACTICES
### (LSA-R.S. 51:1401, *et. seq*)

337.    Plaintiff incorporates, by reference, all previous allegations in the preceding paragraphs, as if fully set forth herein.

338.    Defendants have engaged in actions, as described above, which are unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and to the public.

339.    The acts and omissions of Defendants, as enumerated above, constitute unfair or deceptive acts or practices in the conduct of trade or commerce which have been declared unlawful by Louisiana statutes and jurisprudence.

340.    Because of the dangerously addictive nature of these drugs, the Defendants' manufacturing, marketing, sales, and/or distribution practices unlawfully caused the opioid epidemic plaguing Plaintiff's community.  Each Defendant has a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

341.    The Defendants also omitted material facts in their representations about themselves and their action, causing confusion or misunderstanding as to approval or certification of goods or services.

342.    As alleged herein, Defendants wrongfully represented the benefits, safety, and effectiveness of prescription opioids.

343.    Defendants are thus in violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et. seq.*

344.    Plaintiff seeks all remedies available under Louisiana Revised Statutes 51:1401, *et seq.*, including injunctive relief, compensatory damages, applicable civil penalties, treble damages, attorney's fees, and other appropriate relief.

## DAMAGES

345.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury, because Plaintiff paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference. Plaintiff's injuries were directly and/or proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiff would not have paid the health services and expenditures required to treat, respond to, and otherwise handle opiate-related incidents and opiate-related deaths.  Plaintiff was most directly harmed, and there is no other Plaintiff better

suited to seek a remedy for the economic harms at issue here.  Plaintiff seeks all legal and equitable relief, as allowed by law, including, *inter alia*: actual damages (as described above in language expressly incorporated herein by reference); treble damages; equitable relief; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest.

346.    Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, and patrons and/or residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs associated with increased healthcare and healthcare insurance; (3) costs regarding disability payments; (4) costs associated with special education means, including, but not limited to, special programs for students, employees, and patrons and/or residents with opioid-related learning disabilities, or for students, employees, and patrons and/or residents in need of psychological counseling due to opioid-related crisis; (5) costs associated with providing care for students, employees, and patrons and/or residents suffering from opioid-related disability or incapacitation; (6) costs associated with increased school security and/or campus police costs for all campuses and/or facilities of the University of Louisiana System (including but not limited to increased training, increased staffing, and increased equipment purchases); (7) increased training of faculty, increased staffing of faculty, and increased equipment purchases for faculty; and (8) treble damages. These damages have been suffered, and continue to be suffered directly, by Plaintiff.

347.    Plaintiff has incurred and seeks economic losses (direct, incidental, or

consequential pecuniary losses) resulting from Defendants' actions and omissions, including all counts alleged against Defendants. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

348.    Other than such damages specifically disavowed herein, Plaintiff seeks all legal and equitable relief, as allowed by law (for all counts alleged against Defendants), including, *inter alia*: injunctive relief; restitution; disgorgement of profits; compensatory, treble, and punitive damages; all damages allowed by law to be paid by the Defendants; attorney's fees and costs; and pre- and post-judgment interest.

349.    In accordance with Louisiana Civil Code Article 2324, all Defendants are solidarily liable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that summons be issued notifying Defendants of this Complaint, and that after all legal delays, Defendants be required to answer same, and after all proceedings and a jury trial, there be a judgment in favor of Plaintiff for all amounts commensurate with Plaintiff's damages, including but not limited to: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for students, employees, and patrons and/or residents suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs associated with increased healthcare and healthcare insurance; (3) costs regarding disability payments; (4) costs associated with special education means, including, but not limited to, special programs for students, employees, and patrons and/or residents with opioid-related learning disabilities, or for students, employees, and patrons and/or residents in need of psychological counseling due to opioid-related crisis; (5) costs associated with

providing care for students, employees, and patrons and/or residents suffering from opioid-related disability or incapacitation; (6) costs associated with increased security in all campuses and/or facilities of The University of Louisiana System; (7) treble damages; (8) disgorgement of Defendants' unjust enrichment; (9) all costs and means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct; (10) all other costs and damages specified herein; (11) attorneys' fees, costs, and expenses of suit; (12) pre- and post- judgment interest; and (13) such other relief as the Court deems appropriate.

For the RICO violations, an award of treble damages as consistent with 18 U.S.C. § 1964(c) and/or LSA-R.S. § 15:1351 *et seq.*, compensatory and actual damages, reasonable attorney's fees, pre-judgment interest, post-judgement interest, and costs against Defendants, each and every one of them jointly and severally, and any additional amount that this Court deems just and proper.

Plaintiff further demands a jury trial on all issues so triable.

## CERTIFICATION

By presenting this Complaint to this Honorable Court, the undersigned certifies that, to the best of the undersigned's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims and legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual contentions have evidentiary support.

Filed this 14th day of June 2019.

Respectfully submitted:

**IRPINO, AVIN & HAWKINS**

*/s/ Anthony D. Irpino*
**ANTHONY D. IRPINO,** Bar No. 24727
**PEARL A. ROBERTSON**, Bar No. 34060
2216 Magazine Street
New Orleans, LA 70130
Telephone: (504) 525-1500
Facsimile: (504) 525-1501
E-mail: airpino@irpinolaw.com
        probertson@irpinolaw.com

     -and-


**ALVENDIA, KELLY & DEMAREST, LLC**

*/s/Roderick Alvendia*
**RODERICK ALVENDIA**, Bar No. 25554
**J. BART KELLY**, Bar No. 24488
**JEANNE DEMAREST**, Bar No. 23032
909 Poydras Street, Suite 1625
New Orleans, Louisiana 70112
Telephone: (504) 200-0000
Facsimile: (504) 200-0001
Email:  rico@akdlalaw.com
        bart@akdlalaw.com
        jeanne@akdlalaw.com
        kurt@akdlalaw.com

     -and-

**LAW OFFICE OF KURT A. OFFNER, LLC**

*ls/Kurt A. Offner*
**KURT A. OFFNER**, Bar No. 28176
909 Poydras Street, Suite 1625
New Orleans, Louisiana 70112
Telephone: (504) 200-0000
Facsimile: (504) 200-0001
Email:  kurt@akdlalaw.com

-and-

**STAG LIUZZA, L.L.C.**

*/s/ Michael G. Stag*
**MICHAEL G. STAG**, Bar No. 23314
**ASHLEY M. LIUZZA**, Bar No. 34645
**MATTHEW D. ROGENES**, Bar No. 36652
One Canal Place
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601
Email:  mstag@stagliuzza.com
            aliuzza@stagliuzza.com
            mrogenes@stagliuzza.com

- and -

**SMITH & FAWER, L.L.C.**

*/s/ Randall A. Smith*
**RANDALL A. SMITH**, Bar No. 2117
**STEPHEN M. GELÉ**, Bar No. 22385
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Fax: (504) 525-2205
Email:  rasmith@smithfawer.com
            sgele@smithfawer.com

- and -

*/s/ John F. Young*
**JOHN F. YOUNG**, Bar No.: 01659
609 Metairie Road, # 300
Metairie, La. 70005
Telephone: (504) 352-8855
Email: john@johnyoungla.com

**Attorneys for Plaintiff, The University of Louisiana System**